Nadine REED, Plaintiff–Appellant,

v.

Larry G. MASSANARI,* Acting Commissioner of Social Security, Defendant–Appellee.

No. 99–16066.

United States Court of Appeals, Ninth Circuit.

Submitted Nov. 16, 2000 **

Filed Oct. 30, 2001

---

* Larry G. Massanari is substituted for his predecessor, Kenneth S. Apfel, as Acting Commissioner of the Social Security Administration. Fed. R.App. P. 43(c)(2).

** The panel unanimously finds this case suitable for decision without oral argument. Fed. R.App. P. 34(a)(2).

Peter O. Okin, United States Department of Justice, San Francisco, California, for the defendant-appellee.

Before: KOZINSKI, HAWKINS and BERZON, Circuit Judges.

BERZON, Circuit Judge:

The Commissioner of Social Security determined that Nadine Reed is not entitled to disability benefits or supplemental security income. The district court granted summary judgment in favor of the Commissioner on Reed's challenge to that decision, and Reed appeals. We find that the Administrative Law Judge rejected for an improper reason Reed's request for a consultative examination. We therefore reverse and remand for further proceedings.

## I.

Born in 1959, Reed was employed for almost a decade as a nurse's aid, until poor health forced her to resign. She later worked for approximately one year as a post office clerk but quit in 1993 after a dispute with her coworkers.

For over ten years, Reed has suffered from systemic lupus erythematosus, known as "SLE," or simply "lupus." An autoimmune disease primarily afflicting young women, lupus has various manifestations, including inflammation of the kidneys and lesions on the skin. Reed also complains of fatigue and chronic lower back pain. Beginning in January 1991, she received treatment at the South Central Primary Care Center and Maricopa Medical Center in Phoenix, Arizona.

In January 1994, Reed applied for disability benefits under Title II of the Social

Mark Caldwell, Phoenix, Arizona, for the plaintiff-appellant.

Security Act, 42 U.S.C. § 401, *et seq.*, and for supplemental security income based on disability under Title XVI of the Act, 42 U.S.C. § 1381, *et seq.* Upon referral by the Disability Determination Service of the Arizona Department of Economic Security, Reed was examined by a consultative examiner, Dr. Arcot Premkumar, a Board-certified physician specializing in internal and pulmonary medicine. Dr. Premkumar confirmed that Reed suffers from lupus, noting that she had cutaneous hypersensitivity, but finding no restriction in motion in her joints. Dr. Premkumar did not reach any conclusion regarding Reed's capacity to work or to perform the various functions associated with her previous employment.

At an April 1995 hearing before an Administrative Law Judge ("ALJ"), Reed's medical records and testimony were reviewed by Board-certified internist and neurologist Dr. Lawrence Teitel. According to Dr. Teitel, Reed's medical reports suggest that so long as she takes medication, her case of lupus is at less than "a moderate level of severity" for purposes of the Social Security Listing of Impairments. *See* 20 C.F.R. § 404.1501 *et seq.* Dr. Teitel concluded that Reed retained a residual functional capacity ("RFC") to perform light work. Drawing on Dr. Teitel's conclusion, the ALJ found that Reed "can do her past work as a postal [clerk], which is classified at the light exertional level." He therefore concluded that Reed "was not under a 'disability' as defined in the Social Security Act."

Reed petitioned for review to the Social Security Appeals Council, which remanded the case to the ALJ, directing him to address Reed's subjective complaints (*i.e.,* fatigue) and make findings regarding her credibility. During the administrative hearing on remand, Reed requested a consultative examination by a rheumatologist, arguing that rheumatologists are the medical specialists best suited to address cases of lupus. The ALJ rejected Reed's request for reasons central to this decision, as detailed below. Reiterating his prior conclusion that Reed's lupus was not disabling, the ALJ found Reed "not ... fully credible" with respect to her subjective complaints, and once again issued a decision unfavorable to her.

Reed again sought review by the Appeals Council, arguing inter alia that the ALJ had exhibited bias when rejecting her request for an additional consultative examination. The bias allegation centered on the following colloquy between Reed's counsel and the ALJ:

COUNSEL: I feel a rheumatologist is the best specialist to address lupus.

ALJ: You know the problem with that is that we only have two [available for consultative examinations]. Both of which are totally unreliable. Because they treat all the cases here and everybody is disabled. Every report I've ever seen from them, so I don't trust anything they send me. So, ... that's the problem. Because I considered, frankly, sending this out to a rheumatologist, and I can't get anybody that I trust to tell me.... I don't want to shortchange you ... but I don't trust any of those two doctors, I just don't.

COUNSEL: ... The fact that [medical reports] come back positive more often than not, that may be a reflection of the nature of the people [the doctor] is seeing.... You seem to have some personal feelings about the doctors the State agency sends people to. I don't know how I can possibly address that.

ALJ: ... [L]ike I said, that's the problem, because it occurred to me immediately to send it out to a rheumatologist, but that would do me absolutely no good.

. . .

COUNSEL: . . . I still ask you to give consideration to a rheumatological [consultative examination], if all else fails. ALJ: I wouldn't mind doing a [consultative examination], frankly, but, like I said I don't know where to send it. . . .

. . .

COUNSEL: [I]s it possible to ask the State agency to contract with a doctor that is outside their panel for a one-time examination? ALJ: I think we tried that once and they told us to stick it, frankly, in a nicer way than that, but that's pretty much what they said.

The Appeals Council denied review, finding "no basis for the . . . allegations that the Administrative Law Judge demonstrated bias."

Reed brought this action in the Federal District Court for the District of Arizona, which granted summary judgment in favor of the Commissioner, finding the "determination that the plaintiff is not disabled as a result of her lupus . . . supported by substantial evidence in the administrative record as a whole and . . . free from reversible legal error." This appeal followed.

## II.

The Social Security Act has been with us since 1935. Act of August 14, 1935, 49 Stat. 620. It affects nearly all of us. The system's administrative structure and procedures, with essential determinations numbering into the millions, are of a size and extent difficult to comprehend. But . . . [s]uch a system must be fair-and it must work.

*Richardson v. Perales,* 402 U.S. 389, 399, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971).

■ Critical to the fair and effective operation of the system for distributing social security benefits based on disability is the gathering and presentation of medical evidence. The burden of demonstrating a disability lies with the claimant. *Bowen v. Yuckert,* 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). But it is equally clear that "the ALJ has a duty to assist in developing the record." *Armstrong v. Commissioner of Soc. Sec. Admin.,* 160 F.3d 587, 589 (9th Cir.1998); 20 C.F.R. §§ 404.1512(d)-(f); *id.* at §§ 416.912(d)-(f); *see also Sims v. Apfel,* 530 U.S. 103, 110–11, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000) ("Social Security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits. . . ."). One of the means available to an ALJ to supplement an inadequate medical record is to order a consultative examination, *i.e.,* "a physical or mental examination or test purchased for [a claimant] at [the Social Security Administration's] request and expense." 20 C.F.R. §§ 404.1519, 416.919.

Although referrals to consultative examiners may be made by the Social Security Administration (SSA), "[d]ay-to-day responsibility" for the consultative examination process rests not with the SSA but with cooperating State agencies. *Id.* at §§ 404.1519s(a), 416.919s(a). Among the responsibilities shouldered by State agencies is the task of recruiting suitable physicians to perform consultative examinations. *Id.* at §§ 404.1519s(f)(1), 416.919s(f)(1). The regulations also require State agencies to review the results of consultative examinations for compliance with applicable guidelines. *Id.* at §§ 404.1519s(f)(7), 416.919s(f)(7). Recognizing that review of the consultative examination process will sometimes require medical expertise, SSA regulations require State agencies to institute "[p]rocedures to encourage active participation by physicians . . . in the consul-

tative examination oversight program." *Id.* at §§ 404.1519s(f)(8), 416.919s(f)(8).

In addition, the SSA itself "monitor[s] both the referral processes and the product of the consultative examinations obtained," a procedure that "may include reviews by independent medical specialists."[1]     *Id.*     at     §§ 404.1519t(a), 416.919t(a). Although secondary to the oversight provided by State agencies, SSA monitoring is thorough, involving "periodic comprehensive reviews of each State agency to evaluate [its] management of the consultative examination process," as well as "ongoing special management studies of the quality of consultative examinations purchased." *Id.* at §§ 404.1519t(b), (c), 416.919t(b), (c); *see also* 42 U.S.C. § 421(j)(2)-(3) (requiring the Commissioner to promulgate regulations setting forth detailed standards for consultative examination referrals and procedures for monitoring both the referral process and the products of the examinations).

### III.

■ Within this regulatory framework, the Commissioner "has broad latitude in ordering a consultative examination." *Diaz v. Sec'y of Health and Human Servs.,* 898 F.2d 774, 778 (10th Cir.1990). The government is not required to bear the expense of an examination for every claimant. *See generally* 20 C.F.R.

§§ 404.1517–1519t, 416.917–919t. Some kinds of cases, however, do "normally require a consultative examination," including those in which "additional evidence needed is not contained in the records of [the claimant's] medical sources," and those involving an "ambiguity or insufficiency in the evidence [that] must be resolved." *Id.* at §§ 404.1519a(b)(1), (4), 416.919a(b)(1), (4); *see also Hawkins v. Chater,* 113 F.3d 1162, 1166 (10th Cir.1997) ("[A] consultative examination is often required for proper resolution of a disability claim."); *Brock v. Chater,* 84 F.3d 726, 728 (5th Cir.1996) ("An ALJ must order a consultative evaluation when such an evaluation is necessary to enable the ALJ to make the disability determination."); *Carrillo Marin v. Sec'y of Health and Human Servs.,* 758 F.2d 14, 17 (1st Cir.1985) ("[I]f the Secretary is doubtful as to the severity of [a claimant's] disorder the appropriate course is to request a consultative evaluation. . . . The failure to do so in this instance constitutes the requisite 'good cause' for remand. . . .").

■ This does not mean that a claimant has an affirmative right to have a consultative examination performed by a chosen specialist. However, the agency's actions with respect to consultative examinations must be taken in accordance with regulatory procedures. *Andriasian v. INS,* 180 F.3d 1033, 1046 (9th Cir.1999) (stating that

---

**1.** When it promulgated the regulations, the agency explained the important role played by independent medical specialists:

Complete and reliable medical evidence is a key element in making accurate disability decisions. We spend considerable sums annually to obtain consultative examinations. Because of these expenditures and the need to obtain accurate and complete reports, it is imperative that the consultative examinations and the accompanying reports be of the highest quality. Therefore, it is our intent that all State agencies be open to

monitoring, including reviews by independent medical specialists under contract with SSA, as the need arises. We believe these contractors will demonstrate their value and cost effectiveness in providing us an objective and credible evaluation of a consultative examination provider's practices and competence, which in turn will help ensure the integrity and public confidence in SSA's disability programs.

*Standards For Consultative Examinations and Existing Medical Evidence,* 56 Fed.Reg. 36932, 36949 (Aug. 1, 1991).

an agency abuses its discretion when it fails to abide by its own regulations).

Congress has explicitly directed that the agency's procedures for assessing the work produced by consultative examiners be prescribed by regulation. 42 U.S.C. § 421(j)(3). As we have previously explained, "a primary purpose of requiring agencies to act by regulation is to prevent *ad hoc* policy determinations. When Congress says that the Commissioner shall prescribe circumstances by regulation, we see no reason why the Commissioner should be entitled to prescribe circumstances by other means." *Newman v. Chater*, 87 F.3d 358, 361 (9th Cir.1996). A corollary to this principle is that the Commissioner may not prescribe regulations and then license ad hoc determinations that sidestep the regulatory procedures. An agency has no discretion to circumvent the very regulations that Congress has required it to create.

■ Here, the ALJ's decision to proceed without ordering a consultative examination by a rheumatologist was not based on a determination that the evidence already in the record was sufficient.[2] Indeed, the ALJ acknowledged that a consultative examination would have been appropriate: "I considered, frankly, sending this out to a rheumatologist, but ...;" "I wouldn't mind doing a

[consultative examination], frankly, but...."

It appears instead that the sole basis for the ALJ's refusal to order a consultative examination was his perception that both available examiners with the appropriate specialization conclude that "everybody" is disabled. The implication, of course, is that at least some of these conclusions inaccurately reflect the claimants' true medical status. Thus, the ALJ rested his decision on the premise that both rheumatologists recruited by the State agency are unable or unwilling to provide reliable opinions on matters of rheumatology. This premise amounts to an unfavorable review of the competence of the medical professionals recruited by the State agency · to perform consultative examinations.

In *Miles v. Chater*, 84 F.3d 1397 (11th Cir.1996), the Eleventh Circuit, facing an analogous situation, concluded that ALJs may not take action on the basis of such prejudgment of the reliability of a medical examiner. There, the ALJ had discredited a medical report with the observation that the examining physician "almost invariably conclude[s] that the person being examined is totally disabled." *Id.* at 1399. Finding that the ALJ's comments exhibited impermissible bias, the court of appeals quoted approvingly from the district court:

What is the source and substantiation of these statements? It is certainly not in

---

2. Notably absent from the record before the ALJ was any assessment of Reed's RFC on a function-by-function basis, which could then have been compared with a description of the functions actually required of Reed in her previous employment. Dr. Premkumar failed to address Reed's specific functional limitations, although that information is typically requested in consultative examiners' reports. 20 C.F.R. §§ 404.1519n(c)(6), 416.919n(c)(6). Lacking a function-by-function analysis, the ALJ based his conclusion that Reed could perform her past work on Dr. Teitel's *categorical* RFC assessment, *i.e.*, that Reed retained

the capacity to complete work at the light exertional level. A Social Security Administration ruling specifically warns against this practice of determining a claimant's ability to perform past work on the sole basis of a categorical RFC assessment: "[T]he RFC must not be expressed initially in terms of the exertional categories of 'sedentary,' 'light,' 'medium,' 'heavy,' and 'very heavy' work because the first consideration at this step is whether the individual can do past relevant work as he or she actually performed it." SSR 96–8p.

this record. Is the ALJ reflecting on his own past experience or merely restating gossip within the Social Security family?

.... Whether these comments were based in personal experience or personal animosity, they have no place in the disability evaluation process.

*Id.* at 1400; *see also Miller v. Commissioner of Soc. Sec. Admin.*, 172 F.3d 303, 305 (3d Cir.1999) ("[I]t is erroneous for an ALJ to reject every report submitted by a certain physician ... simply because the physician often reaches the same conclusion ....") (dicta).

Similarly, in this case there is no material in the record to support the ALJ's conclusion that the medical opinions of both available rheumatologists are unreliable. We do not suggest that every decision by an ALJ regarding referral to a consultative examiner must be based on record evidence. *See, e.g.,* 20 C.F.R. §§ 404.1519i(d), 416.919i(d) (SSA will not use a claimant's treating source for consultative examinations where it "know[s] from prior experience that [the] treating source ... consistently failed to provide complete or timely reports."). But the decision at issue here turned on an assessment of the quality of previously rendered medical opinions. That is an issue open to contest, and one that cannot be resolved by an ALJ without analysis from other medical professionals, of which this record is barren.

Permitting the ad hoc disqualification of consultative examiners by individual ALJs would, moreover, short-circuit the consultative examiner evaluation process set forth in detail in SSA regulations. A physician whose examinations regularly pass muster with both the SSA and the cooperating State agency, surviving review by other physicians and independent medical specialists, could be effectively removed from the roster by individual ALJs who

deem the examiner's medical conclusions unreliable. Such ad hoc, auxiliary review by ALJs is not a part of the regulatory scheme. To become so, such a system would have to be introduced by the agency in a notice of proposed rulemaking and subjected to public comment. 42 U.S.C. §§ 421(j)(2), (3); 5 U.S.C. §§ 553(b), (c). Absent those protections, an ALJ may not displace the procedures for evaluating consultative examinations established in the regulations.

Additionally, unlike the formal reviews contemplated by SSA regulations, ad hoc review by ALJs would proceed without access to critical sources of information. The applicable regulations provide for participation in both the State and SSA review process by independent medical professionals, a step that is plainly appropriate where review focuses on the quality of medical opinions provided. 20 C.F.R. §§ 404.1519t(a), 416.919t(a)(SSA); *id.* at §§ 404.1519s(f)(8), 416.919s(f)(8) (State agencies). But ad hoc review by ALJs could result in the de facto disqualification of consultative examiners with no resort to expert medical analysis, based solely on an ALJ's unsubstantiated opinion that certain doctors produce inaccurate results.

■ In short, ad hoc, across-the-board disqualification of State-recruited consultative medical examiners exceeds the ALJ's authority in the disability determination process. The overall caliber of the medical professionals used by State agencies is not a matter placed before the ALJ for decision.

Finally, it is significant that here the ALJ disqualified *all* of the available rheumatologists, thereby depriving both Reed and the agency of the benefits offered by that specialization. Though we have no way of knowing what a consultative examination, if ordered, would have shown in

this case, we note that the disability determination process could be seriously compromised if rheumatologists are prevented from participating in the consultative evaluation of claimants afflicted by lupus and other rheumatic diseases. SSA regulations expressly recognize the important role played by specialists in the disability determination process. The agency "generally give[s] more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." *Id.* at §§ 404.1527(d)(5), 416.927(d)(5).[3] If, as here, an entire speciality is disqualified, there is no opportunity for the ALJ to consider such particularly weighty opinions.

IV.

The ALJ's reason for denying Reed a consultative examination was not in accordance with law. Because the ALJ mistrusts, based on prior experience, the evaluations of the only specialists available to do an consultative examination, he will not be able to assess fairly their testimony. In order for Reed to get a fair hearing, the case must be heard by an ALJ who can fairly consider the opinions of the two available rheumatologists. We remand with instructions that the matter be assigned to a different ALJ. We do not, however, believe that the ALJ is biased

against Reed. We therefore REVERSE and REMAND to the district court for REMAND to the Social Security Administration with instructions that the matter be assigned to a different ALJ for a new determination of Reed's disability status. *Cf. Miles*, 84 F.3d at 1401 (remanding to a new ALJ).***

---

3.  The agency recently acknowledged the importance of specialized knowledge of the *particular* disease suffered by Reed. During the notice and comment period of a proposed rulemaking, the agency heard concerns that doctors without specialized training "may not have an understanding of 'emerging illnesses,' such as ... *lupus erythematosus.*" *Federal Old–Age, Survivors, and Disability Insurance and Supplemental Security Income for the Aged, Blind, and Disabled; Evaluating Opinion Evidence*, 65 Fed.Reg. 11866, 11872 (March 7, 2000) (emphasis added). Citing to section 416.927(d)(5), quoted above, the agen-

cy responded that it already had the authority to "give more weight in an appropriate case to the opinion of a specialist on the individual's particular medical impairment." *Id.*

*** While this statement was made after the ALJ's action at issue here, we nevertheless find the comment instructive on the agency's understanding of the already-existing provision regarding specialists—*i.e.*, that agency-approved specialists on lupus and other newly-understood illnesses will be consulted when appropriate, because their opinions are particularly useful, rather than boycotted as a group.