**UNPUBLISHED ORDER**
Not to be cited per Circuit Rule 53

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued January 24, 2006
Decided July 10, 2006

**Before**

Hon. KENNETH F. RIPPLE, *Circuit Judge*

Hon. ILANA DIAMOND ROVNER, *Circuit Judge*

Hon. TERENCE T. EVANS, *Circuit Judge*

No. 05-1369

| | |
|---|---|
| DONNA PATTY,<br>　　　*Plaintiff-Appellant,*<br><br>　　v.<br><br>JO ANNE B. BARNHART,<br>　　　*Defendant-Appellee.* | Appeal from the United States District Court for the Eastern District of Wisconsin<br><br>No. 04-C-05<br><br>J. P. Stadtmueller,<br>*Judge.* |

**O R D E R**

Donna Patty applied for disability insurance benefits ("DIB") under the Social Security Act in December 2000. The Social Security Agency ("SSA") denied her application and an administrative law judge ("ALJ") concurred, concluding that she was not disabled under the Act because she could perform her past relevant work as a quality control inspector, cashier, and grill cook. The Appeals Counsel declined to review the decision, making the ALJ's decision the final decision of the Commissioner of Social Security. Patty sought judicial review, and the district court affirmed the Commissioner's denial of benefits. Because the residual

functional capacity ("RFC") finding and the hypothetical posed by the ALJ to the vocational expert ("VE") were inconsistent and consequently flawed, we reverse and remand for further proceedings.

I.

Patty was born in August 1962 and did not complete high school. She first received DIB in July 1997 for a closed period of disability ending June 30, 1997, because of, she suggests, "pain in her right arm" (though the circumstances of that application are not contained in the record before us). She reapplied for benefits in December 2000—the application at issue in this appeal—alleging that depression, gastrointestinal problems, fibromyalgia, back and right arm pain, and carpal tunnel syndrome prevented her from working as of May 3, 1998. The medical records that she presented to the ALJ cover the period from her alleged disability in 1998 to her hearing before the ALJ in July 2002.

In the 15 years leading up to May 1998, Patty held a variety of jobs including nurse's assistant and factory worker. She reported in her application for benefits that her illnesses first bothered her in May 1993, but she continued to work for five more years. Even after May 1998 she worked part-time as a veterinarian's assistant, grill cook, cashier for two separate businesses, and an "order picker." But, as the ALJ observed, only the veterinarian's assistant position qualified as "substantial gainful activity."

Though the ALJ's order contains an exhaustive summary of Patty's medical records, we summarize her conditions and some of her doctors' conclusions. Patty's medical records first focus on her gastrointestinal problems. In early 1998 she was diagnosed with possible viral gastroenteritis, but abdominal and pelvic CT scans, and other tests, were negative. Throughout 1998 she visited various gastroenterology consultants. Dr. Ricardo Li noted upper-abdominal tenderness, but an endoscopic retrograde cholangiopancreatography (a test used to diagnose liver, pancreas, gallbladder, and bile duct conditions) and x-rays did not show signs of disease. In January 1999 Dr. Thomas Montagne diagnosed Patty with possible irritable bowel syndrome. He ordered a colonoscopy, which revealed the presence of polyps. Further instances of gastrointestinal problems do not appear in Patty's medical records until, at the beginning of 2001, she again complained of symptoms consistent with irritable bowel syndrome. She was treated by Dr. Harley Sobin throughout 2001 and 2002, but none of the many tests that he ordered showed notable abnormalities.

Patty's complaints of back pain began in June 1999 when she injured herself while working as a veterinarian's assistant. X-rays and CT scans confirmed some spinal abnormality, and Patty continued seeking treatment for back pain from June 1999 through January 2001. In April 2001 Dr. Robert Penn, a consulting examiner

for the SSA, noted that Patty suffered from "known lumbar disk disease including a disk herniating at L4-L5 on the right side."

Patty's remaining physical ailments include fibromyalgia and possible carpal tunnel syndrome. She was first diagnosed with fibromyalgia (an incurable disease characterized by subjective symptoms, predominantly fatigue and widespread pain, *see McPhaul v. Bd. of Comm'rs of Madison County,* 226 F.3d 558, 562 (7th Cir. 2000)) in May 2000 by her general physician, Dr. Ernesto Buencamino. Later, in March 2002, Dr. Douglas Hempel, a rheumatologist who examined Patty, concurred with Dr. Buencamino's diagnosis. In October 2001 Patty first complained of symptoms consistent with carpal tunnel syndrome—including numbness in her right hand—to Dr. Roger Daley, a hand surgeon. After several visits and an electrodiagnostic study, Daley concluded that Patty did not suffer from carpal tunnel syndrome.

In addition to her physical ailments, Patty suffers from depression. In December 1999 family therapist Nancy Habrel indicated that Patty suffered from "major depressive disorder." A psychologist who treated Patty in conjunction with Habrel, Dr. Mary Mungovan, opined from January through June 2000 that Patty suffered from major depression but that prozac and valium improved her condition. Patty did not return to the facility where both Habrel and Mungovan worked until January 2001, when she resumed seeing therapist Habrel but also began seeing a new psychologist, Dr. Ahmad Khan. She again complained of depression and reported that she had not been taking her medication, in part because of financial concerns. Khan recommended that she return to her anti-depressive medications, which Khan's progress notes indicate she did, though Patty was "quite concerned about potential of weight gain." Patty began treatment at a different facility in November 2001. The progress notes of Bayside Clinic generally describe Patty as depressed.

After Patty applied for DIB, the SSA referred her for physical and mental consultative evaluations. SSA consulting physician Dr. Robert Penn examined Patty in April 2001. He opined that her chief complaint was chronic back pain, and concluded based on his physical examination that "she has legitimate issues here." He observed that Patty suffered from "radicular symptoms involving the right leg and chronic low back pain." SSA consulting psychologist Dr. Brian Wolfe examined Patty in May 2001. He observed a "depressed individual who cries periodically throughout the interview." He diagnosed Patty with "a major depressive episode which apparently has come about since the onset of her physical difficulties." He did opine, however, that her "[a]ttentional/ concentrational skills appear to be relatively adequate."

The State of Wisconsin's Department of Health and Family Services also conducted evaluations of Patty's physical and mental health in June 2001. Consulting physician Dr. Robert Callear reviewed Patty's medical record and opined that she could occasionally lift or carry fifty pounds and twenty pounds frequently; stand or walk about six hours in an eight-hour workday, and sit about six hours. He also concluded that she could frequently climb, balance, kneel, crouch, and crawl, occasionally stoop, and was "limited to frequent, but not constant, use of her right arm and hand for feeling, grasping, and manipulating." Dr. John McDermott, another state physician, concurred in Callear's assessment. State consulting psychologist Dr. Jean Warrior reviewed Patty's records and concluded that she showed symptoms of depressive syndrome. She also opined that Patty was markedly limited in "activities of daily living" and moderately limited in "maintaining social functioning" and "maintaining concentration, persistence, or pace." But she concluded that Patty was "currently capable of sustaining unskilled types of work." Dr. Anthony Matkom, another state psychologist, agreed with Warrior's assessment.

In addition to the SSA's and the state's consultants, Patty solicited a written statement from Dr. Sobin, one of her gastrointerologists. He completed an "Irritable Bowel Syndrome Residual Functional Capacity Questionnaire" at her request in June 2002, concluding that her symptoms were "severe enough to interfere with attention and concentration" 6 to 33 percent of an 8-hour workday, but that she was capable of low-stress jobs. He stated that, during an 8-hour workday, she could sit one hour at a time and for a total of about four hours, stand for 30 minutes at a time, and stand or walk for a total of less than two hours. He also opined that she could lift 10 pounds frequently, but never lift 20 pounds, and would be absent from work about four days per month.

Patty and her husband Roger both testified before the ALJ. Patty recounted her medical conditions and stated that she recently underwent surgery related to her gastrointestinal problems (which did not relieve her symptoms) and had her gallbladder removed. She reported recent part-time work as a cashier and grill cook, but also that she had not worked since May 2002 because of her surgeries. She stated that she could lift no more than 20 pounds, that her irritable bowel syndrome continued to require her to use the bathroom 3-4 times per day for 10 to 30 minutes each time, and that she continued to be depressed, though her depression improved when she worked. Her husband corroborated her testimony.

Two experts also testified before the ALJ. Psychologist Dr. Darryl Hischke testified that "there is good evidence in the record for a major depressive disorder" resulting in "mild limitations in activities of daily living." He also noted mild limitations in social functioning, concentration, persistence, and pace, but did not find evidence of "decompensation." Though Hischke concluded that Patty could

work, he also recognized that she would be limited in her ability to remember instructions and might display "anger occasionally in the workplace."

Testifying vocational expert Leslie Goldsmith concluded that Patty could perform her past relevant factory work in quality control and as a grill cook, and possibly her work as a cashier, depending on the "ebbs and flows." Additionally, the ALJ inquired how many jobs existed in Wisconsin for a person of Patty's age and education, who could lift 20 pounds occasionally, lift 10 pounds frequently, required a sit-or-stand option, and had limited use of her right hand. Goldsmith testified that such an individual could qualify for approximately 2,500 security guard or gatekeeper jobs, 1,250 messenger or courier jobs, and 70,000 general office positions in the Wisconsin economy. Goldsmith did note, however, that each job typically allowed only one, or at most two, days leave per month and would not tolerate the long bathroom breaks (of 10 to 30 minutes) that Dr. Sobin included in his RFC assessment.

The ALJ found that Patty was not disabled under the SSA. Characterizing the case as "largely revolv[ing] around the issue of pain and credibility," the ALJ assigned little weight to Dr. Sobin's RFC assessment because it was "inconsistent with the medical evidence" and "conflict[s] to some extent with Dr. Sobin's own contemporaneous progress notes." The ALJ went on to find the rest of Patty's medical evidence consistent with an ability to perform light work, with a restriction on the use of her right arm. Finally, he agreed with the testifying psychologist and other mental health professionals who determined that Patty's mental health allowed her to complete unskilled and low level semiskilled work. Consequently the ALJ, conducting the five-part analysis prescribed by 20 C.F.R. § 404.1520(a), found that Patty had not engaged in substantial gainful activity since 1998, but that her impairments were not listed in, or medically equivalent to the conditions listed in, Appendix 1, Subpart P, Regulations No. 4. He found that Patty's pain was not as severe as she claimed, that she retained the physical and mental RFC to perform some of her past relevant work, and therefore he determined that she was not disabled under the SSA. The ALJ omitted a finding that Patty could also perform other jobs in the economy, though the VE testified that such jobs were within her RFC. The district court affirmed.

## II.

We review the legal determinations of an ALJ de novo, but review factual determinations deferentially, upholding any decision that is supported by substantial evidence. *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). Patty raises four alleged errors by the ALJ, but the argument at the center of her appeal is whether the ALJ properly evaluated her mental RFC and incorporated it into the hypothetical he posed to the VE. Regarding her mental RFC, Patty argues

that the ALJ erred by not explicitly analyzing the effect of her depression in the "four broad function areas" described in 20 C.F.R. § 404.1520a(c)(3) (outlining the process an ALJ must follow to determine a claimant's mental impairment). *See* 20 C.F.R. § 404.1520(e)(2) (ALJ "must incorporate the pertinent findings and conclusions based on the technique.").

Patty contends that, as a result of the ALJ's failure to properly analyze the limitations imposed by her depression, the hypothetical he posed to the VE excluded a discussion of those limitations. The ALJ's written order finds:

> Claimant has the residual functional capacity to perform work-related functions except for work involving more exertional types of tasks beyond a light level, with lifting limited to 20 pounds, carrying to 10-20 pounds and no prolonged standing or walking nor any repetitive use of the right hand, claimant also having a mental capacity for simpler, routine types of tasks of a low level, semiskilled to unskilled nature.

But, the hypothetical that the ALJ posed to the VE made no reference to Patty's mental limitations:

> If I were to propose for the hypothetical a person of the claimant's age and education, who can lift 20 pounds occasionally and 10 pounds frequently, and needs a sit/stand option in terms of the kind of work they do, and experiences only limited use of this right hand. Just looking at those restrictions, could such a person do any of claimant's past work?

Patty argues that this variance is fatal to the hypothetical, notwithstanding the accuracy of the RFC, and thus the ALJ could not have relied on the VE's testimony that she could preform her past relevant work.

The hypothetical that an ALJ poses to a VE "ordinarily must include *all* limitations supported by medical evidence in the record," including limitations imposed by depression. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002); *see also Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir. 2004); *Johansen v. Barnhart*, 314 F.3d 283, 289 (7th Cir. 2002). The hypothetical, though, need not include all of a claimant's alleged impairments. *See Jones v. Shalala* 10 F.3d 522, 525 (7th Cir. 1993); *Ehrhart v. Sec'y of Health and Human Servs.*, 969 F.2d 534, 540-41 (7th Cir. 1992). An ALJ may rely on VE testimony, even if it is in response to an incomplete hypothetical, "[w]hen the record supports the conclusion that the vocational expert considered the medical reports and documents." *Ehrhart*, 969 F.3d at 540.

We have expressed concern when an ALJ fails to inquire about the limitations imposed by depression. In *Steele* we remarked that a hypothetical posed

to a VE was flawed because it did not address how "depression restricted [Steele's] daily activities and social functioning, nor how depression affected his ability to timely complete tasks by interfering with his concentration, persistence, and pace." *Steele,* 290 F.3d at 942. In that case numerous errors plagued the ALJ's denial of benefits. We noted that "it is also true that the jobs identified for Steele to work (such as housekeeper and security guard) might not demand levels of sociability or concentration beyond his capabilities" and thus our concern that depression was not discussed by the VE was "not acute." *Id.* at 942.

Here, we are not confident that the ALJ's omission of Patty's depression from the hypothetical posed to the VE was harmless. *See, e.g., Young,* 362 F.3d at 1004-05. The VE was present for the testimony regarding Patty's mental health and reviewed the record, but that is not always a sufficient guarantee that the VE will consider all of a claimant's limitations. *See id.* at 1003. In this case the VE responded to a hypothetical posed by the ALJ that did not include all of the limitations that even the ALJ's written RFC included. And, the ALJ instructed the VE to consider only those limitations included in the hypothetical. We will therefore not impute to the VE knowledge of the limitations imposed by Patty's depression and accordingly cannot find that the flaw in the ALJ's hypothetical was harmless.

We cannot overlook the variance between the RFC recorded in the ALJ's written order and the hypothetical he posed to the VE, which lacked a discussion of the limitations imposed by Patty's depression. Because the ALJ's decision at step four was based on a flawed hypothetical and the consequently questionable testimony of the VE, the denial of benefits was not supported by substantial evidence. We remand this case to the SSA for further proceedings consistent with this order.

REVERSED and REMANDED.